UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| PHILIP M. SEBOLT, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 2:17-cv-00105-WTL-MJD ) |
| FEDERAL BUREAU OF PRISONS, CLINT SWIFT, | ) ) ) ) |
| Defendants. | ) |

**Entry Granting Defendants' Unopposed Motion for Summary Judgment on Exhaustion and Directing Entry of Final Judgment**

**I. Background**

Plaintiff Philip M. Sebolt is a federal prisoner who at all relevant times has been confined at the Federal Correctional Institution in Terre Haute, Indiana ("FCI-TH"). Mr. Sebolt filed his complaint on March 3, 2017, against the Federal Bureau of Prisons ("BOP") and Clint Swift, case manager. His claims are brought pursuant to the theory recognized in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), and the Administrative Procedures Act, 5 U.S.C. § 702, *et seq*. ("APA"). The *Bivens* claims of failure to protect and retaliation are brought against Mr. Swift. Mr. Sebolt's APA claim is that the BOP made an irrational and baseless decision to terminate and fail to reinstate his prison job as the commissary orderly.

The defendants moved for summary judgment seeking resolution of all claims on the basis that Mr. Sebolt failed to exhaust his available administrative remedies. Mr. Sebolt has not opposed the motion for summary judgment.

For the reasons explained in this Entry, the defendants' unopposed motion for summary judgment, Dkt. No. 34, must be granted.

## II. Legal Standards

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

"The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.*, 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). The substantive law applicable to the motion for summary judgment is the Prison Litigation Reform Act ("PLRA'"), which requires that a prisoner exhaust his available administrative remedies before bringing a suit concerning prison conditions. 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted). In addition to applying to *Bivens* claims, the exhaustion requirement applies to APA claims. *See Richmond v. Scibana*, 387 F.3d 602, 607 (7th Cir. 2004); *Staadt v. Bezy*, 119 Fed. Appx. 784 (7th Cir. Dec. 16, 2004).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)

(footnote omitted); *see also Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) ("In order to properly exhaust, a prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'") (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)). "In order to exhaust administrative remedies, a prisoner must take all steps prescribed by the prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004).

Because exhaustion of administrative remedies is an affirmative defense, the burden of proof is on the defendants to demonstrate that Mr. Sebolt failed to exhaust all available administrative remedies before he filed this suit. *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (internal quotation omitted). The defendants' motion for summary judgment, brief in support, and Rule 56 notice were served on Mr. Sebolt on or about December 27, 2017. Although Mr. Sebolt sought extensions of time to respond, no response has been filed, and the deadline for doing so has passed.

The consequence of Mr. Sebolt's failure to respond is that he has conceded the defendants' version of the facts. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *see* S.D. Ind. Local Rule 56-1(b) ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends

demonstrate a dispute of fact precluding summary judgment."). This does not alter the standard for assessing a Rule 56(a) motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

### III. Discussion

#### A. Undisputed Facts

Accordingly, the following facts, unopposed by Mr. Sebolt and supported by admissible evidence, are accepted as true:

Mr. Sebolt was transferred to the FCI-TH in April 2013. Upon his arrival at FCI-TH, he was assigned to the Communications Management Unit ("CMU"), which is a housing unit environment that enables staff to more effectively monitor communication between inmates in the CMU and persons in the community. The CMU is a self-contained general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreation, religious, visiting, unit management, and work programming.

*1. Inmate Work Assignments Within the CMU*

Program Statement 5251.06, Inmate Work and Performance Pay, provides that when making work assignments, staff are to consider the inmate's capacity to learn, interests, requests, needs, and eligibility as well as the availability of the assignment. Dkt. No. 35-1 at 2. Inmate work assignments are also to be made with consideration of the institution's security and operational needs, and should be consistent with the safekeeping of the inmate and protection of the public.

All CMU inmate jobs occur within the unit and are therefore somewhat limited. Not all inmates in the CMU hold inmate positions and there is no requirement that a position be

provided to every inmate. While an inmate may request to be assigned to a certain job within the institution, there is no requirement to provide him with that position when it becomes available. Moreover, there may be a number of inmates who would like a particular position.

Inmates receive work assignments and may be removed from work assignments for any number of reasons, including, but not limited to, being sent to the Special Housing Unit ("SHU"), being sent out of the institution on writ, receiving an incident report, or going to an outside hospital. When an inmate is placed in the SHU, he is placed on an "unassigned" status because he is not permitted to report to or engage in a work detail assignment while in the SHU.

*2. Mr. Sebolt's Work History in the CMU*

Mr. Sebolt was assigned to the CMU at FCI-TH from April 8, 2013, until June 17, 2013, and again from August 22, 2013, to May 27, 2014. He returned again on July 21, 2014, and was housed in the CMU until his release to the general compound on April 18, 2017.

Once Mr. Sebolt arrived in the CMU, he was at various times assigned to a work position and at various times placed in an "unassigned" status during which he did not have a work assignment. On March 30, 2015, he was assigned to a CMU Orderly position until April 30, 2015, when he was reassigned to a CMU Commissary Orderly position. He held that position until he went into the SHU on May 17, 2016. He was removed from the position on May 19, 2016, and placed in an "unassigned" status. He remained in an "unassigned" status until he was transferred out of the CMU on April 18, 2017, to the general compound.

*3. Mr. Sebolt is Placed in the CMU SHU on May 17, 2016*

On May 17, 2016, the Operations Lieutenant was notified of a possible physical altercation that may have taken place within the CMU. The unit was secured with the inmates locked in their cells. The Lieutenant received a "drop note" from an inmate indicating that an

assault or fight between Mr. Sebolt and another CMU inmate may have taken place. Both inmates were moved to the SHU that night pending investigation.

Because Mr. Sebolt was in the SHU, he was not permitted to report to or engage in a work detail assignment. Another inmate was assigned to the Commissary Orderly position. On May 20, 2016, Mr. Swift told Mr. Sebolt that his work detail status would be changed to "unassigned." Dkt. No. 35-1 at 3; Dkt. No. 1 at 8-9. Mr. Swift told Mr. Sebolt that if he wanted to work for the Commissary again or wished to have any other work detail assignment, he would have to make that request upon his release from the SHU. Dkt. No. 35-1 at 3.

On May 20, 2016, CMU Intelligence Research Specialist E. Keller interviewed Mr. Sebolt in conjunction with her investigation regarding the alleged altercation. Dkt. No. 35-11 at 2. Mr. Sebolt told Specialist Keller that he was concerned about losing his job due to his placement in the SHU. He asked if he would be able to get another job with the Trust Fund. Specialist Keller told Mr. Sebolt that inmate job assignments were a unit team function, but that there would likely be other jobs he could put in for when he was released from the SHU. At this time, Mr. Sebolt was not sure he could safely return to the unit.

On May 23, 2016, Specialist Keller received a "cop-out" from Mr. Sebolt. Dkt. No. 35-11 at 2; Dkt. No. 35-12 at 1. In the "cop-out," Mr. Sebolt advised Specialist Keller that he believed that he and the other inmate could both remain in the same unit safely and that they could both return to the CMU. He additionally wrote that "[m]aybe he wont [sic] be after me since I no longer have the comm. job." Dkt. No. 35-11 at 2; Dkt. No. 35-12 at 1. Mr. Sebolt further indicated that he knew he no longer was assigned to the Commissary Orderly position, when he wrote, "[a]s for job, I'll gladly take a unit orderly job until a TF [Trust Fund] dept. job opens up." *Id.*

Mr. Sebolt was released from the SHU on May 25, 2016, after it was determined that both he and the other inmate could safely return to the general population in the CMU. Mr. Sebolt did not request a work detail assignment when he was released from the SHU.

*4. The BOP Administrative Remedy System*

The BOP has promulgated an administrative remedy system which is codified in 28 C.F.R. §§ 542.10, *et seq*., and BOP Program Statement 1330.16, Administrative Remedy Procedures for Inmates. The administrative remedy process is a method by which an inmate may seek formal review of a complaint related to any aspect of his imprisonment. 28 C.F.R. § 542.10; Dkt. No. 35-4 at 2.

For an inmate to exhaust his remedies, he must attempt an informal resolution (BP-8) of his complaint and then file a formal remedy request with the Warden (BP-9) within twenty (20) days following the date on which the basis for the request occurred. 28 C.F.R. § 542.14(a). If the inmate is dissatisfied with the Warden's response, he may appeal to the Regional Director (BP-10), which is assigned a numerical tracking number ending with R1, within twenty (20) days of the Warden signing the BP-9 response. 28 C.F.R. § 542.15(a). If dissatisfied with the Regional Director's response, the inmate may appeal to the General Counsel (BP-11), which is assigned a numerical tracking number ending with A1, within thirty (30) days of the Regional Director signing the BP-10 response. 28 C.F.R. § 542.15(a). Once an inmate receives a response to his appeal from the General Counsel (Agency response to BP-11), after filing administrative remedies at all required levels, his administrative remedies are deemed to be exhausted as to the specific issue(s) raised.

All BOP Program Statements are available for inmate access via their respective institution law library, including BOP Program Statement 1330.18, Administrative Remedy

Procedures for Inmates, and Institution Supplement THX-1330.18B, Administrative Remedy Program. Additionally, administrative remedy filing procedures are outlined and explained to the inmates each time they arrive at a federal prison as part of the Admission and Orientation process. Inmates are likewise instructed where to find BOP Policy, FCC Terre Haute Institution Supplements, and how to access the inmate Electronic Law Library. Finally, inmates are informed that if they have an issue or question for staff, they can ask in-person or submit an Inmate Request to Staff.

All administrative remedy requests filed by inmates are logged and tracked in the SENTRY computer database, which is an electronic record keeping system utilized by the BOP. The BOP Technical Reference Manual, 1301.02, Part 2, Section E provides an explanation of the "Status Codes" and "Status Reasons" utilized to denote action taken in reference to administrative remedies filed by inmates.

*5. Remedy No. 869071*

On July 11, 2016, Mr. Sebolt submitted an informal resolution form indicating that he did not believe it was fair that he had been terminated from the Commissary Orderly position and that he believed he was entitled to get the position back. Dkt. No. 35-10 at 2. The document was returned to Mr. Sebolt with the notation that his work detail status was currently "unassigned," and that if he wanted to be considered for another position, he should submit an Inmate Request to Staff form with a request for the specific work detail he desired, and that when a work detail assignment became available he would be considered for the position. *Id.*

On July 14, 2016, Mr. Sebolt submitted a remedy request at the institution level (BP-9) (Remedy No. 869071-F1) in which he complained about his loss of the commissary position and asked "to get my commissary job back." Dkt. No. 35-4 at 5; Dkt. No. 35-10 at 4. This remedy

was voided when he submitted an identical claim on July 25, 2016. Dkt. No. 35-4 at 5. The remedy was identified as Remedy Case No. 869071.

On July 26, 2016, the BP-9 (Remedy No. 869071-F2) was rejected ("REJ") as being untimely submitted ("UTF"). It was returned to Mr. Sebolt with an explanation that he had been terminated from his position on May 19, 2016, and that Program Statement 1330.18 of the Administrative Remedy Program required that his complaint be made within 20 days of the incident. Dkt. No. 35-4 at 5; Dkt. No. 35-9 at 2.

Mr. Sebolt submitted a BP-10 (Remedy No. 869071-R1) to the Regional level 30 days later, on August 25, 2016. Dkt. No. 35-4 at 5; Dkt. No. 35-9 at 3. This remedy was also rejected as having been submitted to the wrong level or wrong office with directions to first submit a BP-9 through the institution level for the Warden's review and response before submitting it to the Regional Director. Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 3.

On September 12, 2016, Mr. Sebolt submitted his remedy under Remedy No. 869071-R2 to the Regional Director, and the remedy was again rejected ("REJ") for the same reasons as above with an additional note that the inmate must receive a response from the Warden in order to appeal to the Regional level. Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 3.

On October 4, 2016, Mr. Sebolt submitted his administrative remedy ("BP-11") (Remedy No. 869071-A1) to the next level at the Office of General Counsel ("OGC"). Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 4. It was rejected ("REJ") on October 31, 2016, with a notation that the appeal was not submitted on the proper form ("FRM") and with other directions for Mr. Sebolt to follow. Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 4. Specifically, Mr. Sebolt was advised that if staff provided a memo stating the late filing was not his fault, then he would be permitted to re-submit his request to the level of the original rejection. Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 4.

On December 13, 2016, 43 days later, Mr. Sebolt resubmitted the same administrative remedy to the OGC (Remedy No. 869071-A2). Dkt. No. 35-4 at 6; Dkt. No. 35-9 at 4. He did not include a memo from BOP staff stating the late filing was not his fault. This resubmission was rejected on December 27, 2016, for the same reasons and with another notation that he could re-submit the request to the level of the original rejection along with a memo from staff that the late filing was not his fault. *Id.*

*6. Mr. Sebolt Did Not File Any Remedies Concerning His Claim of Failure to Protect*

A review of the remedies submitted by Mr. Sebolt for the period of May 17, 2016, through March 3, 2017, the day Mr. Sebolt filed his complaint, reveals that Mr. Sebolt submitted a complaint requesting mail that had been rejected, Dkt. No. 35-8 at 40, Remedy 869071 regarding his job loss, Dkt. No. 35-8 at 40-44, and a complaint requesting his medical copay be returned, Dkt. No. 35-8 at 41, 43. Dkt. No. 35-4 at 7. Mr. Sebolt did not submit an administrative remedy with regard to any claim that the BOP failed to protect him from an assault by another inmate. Dkt. No. 35-4 at 7.

*7. Mr. Sebolt's Familiarity with the Administrative Remedy Program*

Mr. Sebolt submitted 85 administrative remedy requests from November 6, 2006, through the date of the filing of his complaint on March 3, 2017. Dkt. No. 35-4 at 4. He had access to the administrative remedy process at all times, even when he was housed in the SHU. Inmates are able to request administrative remedy forms from staff every day at mail call and any other time.

*8. Mr. Sebolt is Transferred to FCI-Tucson, Arizona.*

On July 21, 2017, Mr. Sebolt was transferred from FCI-TH to FCI Tucson, Arizona.

**B. Analysis**

1.    *Loss of Job Claims Under the APA and Bivens*

It is undisputed that Mr. Sebolt was transferred to the SHU on May 17, 2016, while an investigation was conducted regarding his claim that he had been assaulted by another inmate. As a result, Mr. Sebolt lost his Commissary Orderly job, he was placed in an unassigned status, and another inmate was given that job. Mr. Sebolt lost the position as of May 19, 2016. He was informed of the loss of the position by both Mr. Swift and Specialist Keller. On May 20, 2016, Mr. Sebolt expressed his concern to Specialist Keller about losing his job. He also acknowledged losing the Commissary Orderly job on May 23, 2016, when he wrote in his "cop-out" that he "no longer [had] the comm. job" and that he would "gladly take a unit orderly job" upon his return to the CMU.

Mr. Sebolt's remedy was due twenty (20) days after May 19, 2016, or by June 8, 2016. If the Court were to consider using the date of May 23, 2016 (when he acknowledged that he was no longer assigned the commissary position), Mr. Sebolt's remedy would have been due by June 13, 2016. Mr. Sebolt did not submit his remedy until July 14, 2016, over a month late. Mr. Sebolt was informed that he could submit a memo from a BOP staff member to try to excuse his untimeliness, but he did not do so. The defendants therefore argue that Mr. Sebolt's First Amendment retaliation claim under *Bivens* and his APA claim, both related to his job loss, were not timely exhausted.

Mr. Sebolt has not opposed the facts presented by the defendants. In granting Mr. Sebolt's first motion for extension of time to respond to the motion for summary judgment, the Court acknowledged that he alleged that "he needs to conduct discovery to support his position that he was not definitively made aware that his job was terminated until July 5, 2016. The plaintiff is entitled to conduct discovery related to the issue of his failure to exhaust administrative remedies, however, he is reminded that he may file his own sworn statement as

part of his evidence." Dkt. No. 40. The Court directed the plaintiff: "In his response, he should also directly confront the fact that he stated in his 'cop-out' dated May 23, 2016, that 'I no longer have the comm. job.' Dkt. No. 35-12." Dkt. No. 40. The Court granted the plaintiff's motion for enlargement of time and encouraged the parties "to cooperate and promptly serve and respond to any relevant discovery requests." *Id.* The Court also granted Mr. Sebolt's second motion for extension of time, but his extended deadline to respond to the motion for summary judgment was May 25, 2018, which has come and gone without a response.

### 2. *Failure to Protect Bivens Claim*

Mr. Sebolt also alleges that Mr. Swift failed to protect him from an assault by another inmate in violation of the Eighth Amendment. The alleged assault took place on May 17, 2016, so any remedy would have been due on or before June 6, 2016. It is undisputed that Mr. Sebolt did not submit any remedy alleging that Mr. Swift failed to protect him from assault.

### IV. Conclusion

The Seventh Circuit "has taken a strict compliance approach to exhaustion." *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018). "An inmate must comply with the administrative grievance process that the [BOP] establishes…" *Id.*; *see also Ross*, 136 S. Ct. at 1856 (the mandatory language of the PLRA "means a court may not excuse a failure to exhaust…"). It is undisputed that Mr. Sebolt did not timely begin and complete the exhaustion process relating to his loss of job claims. Moreover, he did not file any grievances concerning his failure to protect claim against Mr. Swift before filing this action. Accordingly, the defendants are entitled to summary judgment on all claims.

The consequence of Mr. Sebolt's failure to exhaust his administrative remedies, in light of 42 U.S.C. § 1997e(a), is that this action must be dismissed without prejudice. *See Ford*, 362

F.3d at 401 (holding that "*all* dismissals under § 1997e(a) should be without prejudice.").

For the above reasons, the defendants' motion for summary judgment, Dkt. No. 34, is **granted.** Final judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 7/3/18

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

PHILIP M. SEBOLT
14682-424
TUCSON - USP
TUCSON U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 24550
TUCSON, AZ 85734

Debra G. Richards
UNITED STATES ATTORNEY'S OFFICE
debra.richards@usdoj.gov